<pre>
 1                    UNITED STATES DISTRICT COURT
                    SOUTHERN DISTRICT OF MISSISSIPPI
 2                         NORTHERN DIVISION

 3

 4   UNITED STATES OF AMERICA

 5          vs.              Criminal Action No. 3:16CR50-DPJ-FKB

 6

 7   CARL REDDIX

 8

 9          COURT REPORTER'S TRANSCRIPT OF SENTENCING

10

          BEFORE HONORABLE DANIEL P. JORDAN, III
11           UNITED STATES DISTRICT COURT JUDGE

12                      December 15, 2017
                       Jackson, Mississippi
13

14   APPEARANCES:

15   MR. DARREN J. LAMARCA
     MR. PATRICK LEMON
16   Assistant United States Attorneys

17

18          Representing the Government,
            United States of America
19

20   MR. MICHAEL V. CORY, JR.
     MR. ROBERT JOHNSON
21   Attorneys at Law

22          Representing the Defendant,
            Carl Reddix
23

24   COURT REPORTER:
     Brenda D. Wolverton, RPR, CRR, FCRR
25   Jackson, Mississippi
</pre>

1       THE COURT:  All right.  Mr. LaMarca, will you please

2  call your case?

3       MR. LAMARCA:  Thank you, Your Honor.  The matter

4  before the court is United States versus Carl Reddix, Criminal

5  No. 3:16cr50.  Mr. Reddix is present in court, Your Honor, with

6  his attorneys, Michael Cory and Robert Johnson, and is present

7  for sentencing as to Count 7 to which he pled guilty of the

8  indictment.

9       THE COURT:  All right.  Counsel, will you come up with

10 your client, please?  Good morning.

11      THE DEFENDANT:  Good morning.

12      THE COURT:  Just to reset a little bit, we obviously

13 started this process before.  There were questions regarding

14 the forfeiture amount.  I asked the parties to do some

15 additional briefing on that.  When I ruled on that issue, there

16 was another issue that appeared to me.  I therefore asked the

17 parties to address it.  I have now ruled on the forfeiture

18 issue.  We will take up the other issue in a minute, but I

19 think that we are ready to proceed.  Mr. Cory, are you ready to

20 proceed?

21      MR. CORY:  Yes, Your Honor.

22      THE COURT:  All right.  I'm going to start from the

23 beginning because I think that's probably the safest thing to

24 do.  Dr. Reddix, let me ask you did you have a chance to review

25 the presentence report and the addendum with your attorneys?

1          THE DEFENDANT:  Yes.

2          THE COURT:  Okay.  And did you have a chance to ask

3   them any questions you might have about what those documents

4   say?

5          THE DEFENDANT:  Definitely.  Yes.

6          THE COURT:  Okay.  Were they able to answer your

7   questions for you?

8          THE DEFENDANT:  Yes.  I didn't like all the answers.

9          THE COURT:  I can understand that, but you understood

10  the answers?

11         THE DEFENDANT:  Yes.  I did.

12         THE COURT:  Is there anything about the presentence

13  report or the addendum that you do not understand?

14         THE DEFENDANT:  No, sir.

15         THE COURT:  All right.  And I'm sorry.  Mr. Johnson,

16  who is taking the lead here this morning?  It has been Mr.

17  Cory, but --

18         MR. CORY:  I will this morning.

19         THE COURT:  Okay.  Would you agree that you have had

20  an opportunity to go through the presentence report with your

21  client and that he does understand what it says?

22         MR. CORY:  Yes, sir.

23         THE COURT:  Okay.  There was a motion filed this

24  morning.  I assume there is no objection to the motion.  Is

25  that right?

```
1              MR. CORY:  No, Your Honor.

2              THE COURT:  Okay.  I will just -- without closing the

3      record, I will just say for the record that I have considered

4      the motion.  I think it's well-taken and it is granted.

5              All right.  There is also an objection with respect to

6      the loss amount.  Dr. Reddix, if you like, you can return to

7      your seat at this point.  I will just hear from the attorneys.

8              MR. CORY:  Your Honor, would you like me to address

9      that issue briefly?

10             THE COURT:  Please.

11             MR. CORY:  Your Honor, the court brought I guess -- we

12     have submitted a brief and objection to the 2C1.1 calculation

13     of the loss amount of $2.5 million and ask that this court

14     reduce that for sentencing purposes by Mr. Reddix's 50 percent

15     ownership interest in Health Assurance to approximately

16     $1.2 million.  I don't have any additional arguments to make

17     that aren't reflected in the brief and objection we submitted,

18     but we would ask the court to consider that objection and make

19     an appropriate ruling.

20             THE COURT:  All right.  Let me ask you this.  Both

21     parties cited United States v. Bankston, and it seems like that

22     case does sort of square up the issue in terms of factual

23     question of whether or not the defendant was acting on his own

24     behalf or as an agent for, in this case, Health Assurance, LLC.

25     Would you agree that that's sort of the factual question I need
```

1    to resolve?

2          MR. CORY:  Yes, sir.

3          THE COURT:  And do you wish to put on any evidence

4    with respect to that issue?

5          MR. CORY:  No, sir.

6          THE COURT:  Okay.  All right.  Is there anything

7    further?

8          MR. CORY:  No, sir.

9          THE COURT:  All right.  Thank you.  Mr. LaMarca?

10         MR. LAMARCA:  Thank you, Your Honor.  Your Honor, we

11   do stand by our response to the court's order.  We do agree

12   with the court that the issue is whether distilled factually

13   for this case the issue being whether the defendant was acting

14   as an agent for Health Assurance.

15         I would submit to the court that there is one

16   additional factual issue that I am not sure if the court is

17   aware but I want to present it to the court.  If the defendant

18   disagrees with it, then we are prepared to put on some

19   testimony.

20         If the court may look to Paragraph 35 on Page 20 of

21   the PSR, it would be towards the end of that paragraph where in

22   the Title III conversation the defendant states that *I will go*

23   *back and talk to Hattie to be sure, but, like I said, that part*

24   *ain't never had an issue.*  They were discussing at this moment

25   whether the funds would be available for Mr. Epps as part of

the counting and the money from the contract that's going to Health Assurance.

THE COURT: I think I just found it. That's a really long paragraph.

MR. LAMARCA: It is, Your Honor.

THE COURT: Page 20?

MR. LAMARCA: Yes, sir. Page 20 about three or four paragraphs from Paragraph 36.

THE COURT: And who is Hattie?

MR. LAMARCA: Hattie is an accounting bookkeeper for Health Assurance. And if the court will see that on Paragraph 44, there was an interview of the defendant back on October 30th. And during that interview, the defendant, although not recounted in the PSR, the defendant explained that Hattie is Hattie Armstrong, an employee with Health Assurance, and was aware and assisted the defendant in finding ways to come up with the cash; that the defendant would, with Ms. Hattie, find receipts for items purchased with cash so that the receipts could be used to cover up where the cash was spent.

And I say this to the court factually that these things if they are accepted by the court as being true show that the funds that were actually being paid for the bribes and kickbacks were hidden, concealed, through the efforts of receipts and originate from Health Assurance.

So I think that's an additional factor other than what was legally explained in our brief to the court with regard to the different purposes of forfeiture, what's foreseeable in the sentencing guidelines and for sentencing purposes.  So we stand by that.  And we also wanted to present to the court that factual distinction.  And, as I said, if the defendant disagrees with what I have said, we are prepared to put on proof to that effect.

THE COURT:  Okay.  All right.  Is there anything else?

MR. LAMARCA:  No, Your Honor.

THE COURT:  All right.  Mr. Cory, I will let you respond to that.

MR. CORY:  Yes, sir.  We don't -- the defendant does not dispute that funds -- that certain funds that were used to pay the kickbacks to Mr. Epps came from Health Assurance.  I would clarify.  I do think the dispositive issue before the court is whether he was acting as an agent.  But in the *Bankston* case, they used the term -- they referred to RICO enterprise liability and joint enterprise and whether it was an individual bribe, and then they referenced back to the fact that the expected benefit to receive -- to be received under 2C1.1 is the benefit to the actual payer of the bribe.

A distinguishing feature in my mind at least is that in the *Bankston* case, the other owners of the company were not involved in any way and the bribes were still individual

between the recipient of the bribe and the payer of the bribe
even though it benefited the company as a whole. It was not a
joint enterprise. So I think that is a distinguishing feature,
but we don't disagree that the money or at least some of the
money came out of Health Assurance funds.

THE COURT: Okay. Anything else?

MR. CORY: No, sir.

THE COURT: All right. Give me just one minute.

(SHORT PAUSE)

THE COURT: All right. The objection is overruled.
The presentence report calculates the loss amount based on the
profits to Health Assurance, LLC. And initially all the
parties were in agreement with that calculation. When I looked
at the arguments regarding forfeiture, it occurred to me that
the defendant might be able to make an argument that the
analysis regarding forfeiture might also apply to the
calculation of loss amount. It's obviously my objective in
every case to make sure that the guidelines are correctly
calculated, and I take that responsibility seriously, so I
asked the parties to brief it.

The relevant section of the guidelines is 2C1.1(b)
which addresses a specific offense characteristic. In Subpart
2 it states that if the benefit received or to be received in
return for the payment exceeded $6,500, then you increase by
the number of levels in Table 2B1.1.

1    The issue here is whether or not that term, *benefits*

2  *received,* should be defined as benefits received personally by

3  the defendant.  The defendant was a 50 percent owner of Health

4  Assurance, and so he would have received 50 percent of the

5  profit of the over $2.5 million.  Application Note 3 states

6  that loss for purposes of Section (b)(2) shall be determined in

7  accordance with Application Note 3 of the commentary to Section

8  2B1.1.  So if you look at that application note, it states that

9  actual loss means the reasonably foreseeable pecuniary harm

10  that resulted from the offense.  It then defines that term to

11  mean pecuniary harm that the defendant knew or under the

12  circumstances reasonably should have known was a potential

13  result of the offense.

14    These passages do not directly answer the question

15  whether the term, *benefits received,* means personally received,

16  but they certainly suggest that it is broader than what the

17  defendant personally pocketed when it defines loss as pecuniary

18  harm and talks about potential result of the offense.  That

19  said, both parties have focused on *United States v. Bankston,*

20  182 F.3d 296, which is a Fifth Circuit case from 1999.  And in

21  that case there was a similar issue in the context of a RICO

22  case where the defendant had bribed a legislator to avoid

23  passing certain laws that would regulate video poker

24  businesses, and the loss amount was determined to be

25  50 percent -- I'm sorry -- the defendant's 50 percent interest

1  in that company.

2          The government filed a cross appeal in that case

3  saying that the ownership percentage of the defendant should

4  not have reduced the loss amount and specifically contended

5  that the court erred in limiting the term, *benefit*, as used in

6  2C1.1(b)(2)(A) to personal benefit.

7          As I noted earlier, it appears that the case came down

8  to the question of who is the payer.  And on that question the

9  Fifth Circuit said there is a question of whether the defendant

10 paid the bribes individually or as the agent for the larger

11 company.  And the Fifth Circuit concluded that that's a fact

12 question and it found that the record evidence in that case was

13 sufficient to support the district court's conclusion that the

14 bribes were paid individually and not as an agent and therefore

15 the payer in that case was the defendant himself individually.

16         Looking at agency principals then agency is a

17 relationship which results from the manifestation of consent by

18 one person to another that the other shall act on his behalf

19 and subject to his control and consent.  In this case it seems

20 fairly obvious to me that Dr. Reddix as the 50 percent owner of

21 Health Assurance, LLC, and as its manager would exercise both

22 actual and apparent authority on behalf of Health Assurance,

23 LLC.

24         It's also apparent from the recordings of the

25 conversations between Dr. Reddix and Mr. Epps that Dr. Reddix

1   was initially paying Epps bribes to maintain Health Assurance's

2   contracts.  Later in the recordings, specifically Paragraph 31,

3   the defendant talks about getting bids and is discussing the

4   clinic as a whole, not just himself but what the clinic would

5   do and how Mr. Epps would help the clinic keep his contracts

6   and gain other contracts.

7           I would also say based on what I have heard today

8   which was information that was not available to me before that

9   if the question is who is the payer and the evidence now shows

10  that Dr. Reddix was working in conjunction with somebody in an

11  accounting capacity at Health Assurance to hide these payments

12  and if the payments themselves were actually coming from Health

13  Assurance, then it appears to me that Health Assurance is the

14  payer.  I just don't think that you can say from the nature of

15  this scheme that he paid those bribes just for himself or his

16  own benefit.  It was to prop up the company that he owned and

17  managed, and obviously the benefits of those contracts enured

18  not only to him but also to Health Assurance itself.

19          It's also apparent to me and it seems relevant that

20  Dr. Reddix was not the only person associated with Health

21  Assurance that was involved in this scheme.  We have the

22  information today that's not disputed that the accounting

23  department was involved in it, too.  I'm also aware that Robert

24  Simmons was involved in bribes related to Health Assurance's

25  contracts on the coast.

1    Based on all of that, it appears to me that the
2    presence report was correctly calculated all along, and the
3    objection is therefore denied.  You can come back up.

4    All right.  I'm sorry.  Dr. Reddix, I need you to come
5    back up, too.  Counsel, I will start with the government.  It
6    appears that the maximum term of incarceration is not more than
7    10 years.  Based on the motion that I did grant today, the
8    offense level is 30, Criminal History Category is a I, and the
9    guideline range of imprisonment is 97 to 120 months.  Does the
10   government agree?

11   MR. LAMARCA:  Yes, Your Honor.

12   THE COURT:  All right.  Mr. Cory, based on my rulings
13   today, do you agree with those guidelines calculations?

14   MR. CORY:  Yes, Your Honor.

15   THE COURT:  All right.  Dr. Reddix, when you entered
16   your plea, I told you that you would have an opportunity to
17   tell me anything that you wanted me to know before the sentence
18   is imposed, and I mentioned then that you could speak for
19   yourself or have your attorney speak for you or both, but now
20   is your opportunity to exercise that right.

21   THE DEFENDANT:  Okay.  Well, let me just --

22   MR. CORY:  Judge, our plan this morning was to call
23   one character witness and then have Mr. Robert Johnson make a
24   brief argument with respect to our sentencing request and then
25   have Mr. Reddix allocute.

1    THE COURT:  That's fine with me.  Did you want to call

2  your witness?

3    MR. CORY:  Yes, sir.  You can sit down.  Dr. Reddix

4  would call Mr. Walter Johnson.

5                    **WALTER JOHNSON,**

6  having first been duly sworn, testified as follows:

7                   **DIRECT EXAMINATION**

8  BY MR. CORY:

9  Q    Good morning.

10  A    Good morning.

11  Q    Mr. Johnson, would you tell the court your full name and

12  address, residence address?

13  A    Walter Johnson, 124 Hickory Glen, Madison, Mississippi.

14  Q    And where do you currently work?

15  A    I work for the law firm of Watkins & Eager here in Jackson.

16  Q    And how long have been at Watkins & Eager?

17  A    Since 1990.

18  Q    And briefly what's the nature of your practice?

19  A    I represent the medical community in Mississippi and I

20  represent Pfizer across the country and I represent Bayer

21  across the country.

22  Q    Mr. Johnson, how long have you known Carl Reddix?

23  A    I met Carl -- I have known of Carl for many years but -- by

24  reputation, but I met him around 1992, '93.

25  Q    And how did you come to know Mr. Reddix?

A    I was a young lawyer, and Carl and a Dr. Paul Rice were
involved in a piece of litigation against -- as well as Hinds
General Hospital which is now I think called Merit Hospital,
and we ended up trying a lawsuit.  Carl and Dr. Rice were both
acquitted.  It was a pretty dangerous case.  I think the
verdict ended up being around 2 million or $3 million, it's
been a long time, against the hospital.  And we became friends
after that.  And actually my business grew as a consequence of
that trial.

Q    Now, how did your relationship with Dr. Reddix evolve after
that trial?

A    Whenever Carl had legal matters related to his profession,
he would contact me, and we just became friends.

Q    Just briefly describe the nature of the friendship.  Was
it -- did you go to his house, did you do things like that, or
was it more professional?

A    It was both personal and professional, but I think I have
been to Carl's house one time in my life, and we didn't, you
know, go out together or anything like that but we communicated
pretty regular.  We talked about ideas, politics, family, those
kind of things.

Q    Do you have any personal knowledge of Carl's interest in
public health and healthcare, prison healthcare, those types of
things?

A    I do.  Carl is an interesting man.  He is most intelligent,

1    very well educated.  He went to Tougaloo College.  So did I.

2    And so did many African-American physicians in Mississippi as

3    well as lawyers.  And Carl left Tougaloo and went to Tufts and

4    got his medical degree behind him from Tufts.  Then he went to

5    Johns Hopkins and got his OB/GYN residency completed, and then

6    he went to Harvard in public health.  Carl had a public health

7    slant to him and he was concerned about the disparities in

8    healthcare across Mississippi as well as the southeast.

9    Q    And what was your involvement or with Health Assurance

10   itself?

11   A    Multiple involvements.  Carl actually started talking about

12   formulating a company that provided healthcare services to

13   prison inmates.  And there were four people.  I saw George

14   Terry.  He is here today.  And there was one other person,

15   Michael Reddix and Carl Reddix.  And they put together a

16   business plan, this concept.  And they would get together on

17   Tuesdays at like 6:00, 7:00, and somebody would bring a bag of

18   potato chips, some Oreos, a Coca-Cola, and they would sit down

19   and talk about putting this thing together, which they did

20   successfully.

21   Q    And do you know why Dr. Reddix wanted to do that?

22   A    Well, I think in large part, and Carl can probably tell you

23   about this probably better than I, but Carl came from a family

24   that was service oriented.  And I think really that kind of

25   under-rode everything.  But Carl was concerned about just the

1  healthcare disparities that poor people received,

2  African-Americans received, and his entire life has been

3  dedicated to providing health services and just general care to

4  poor people.  That's what he has done.

5      He left New England.  He came back to Mississippi in the

6  early nineties.  And when he got here, he ended up having to

7  pay back some time doing some public service and I think he

8  worked for Jackson Hinds Comprehensive Clinic.  He worked over

9  in Rankin County, government clinic, Madison County.  And he

10 had a short term to pay back.  But Reddix continued to work at

11 Jackson Hinds for most of his career that he did obstetrics.  I

12 think he delivered babies for about 15 years and then he moved

13 into other things but continued his GYN practice.  And the

14 reason he stayed at Jackson Hinds is because they didn't have a

15 doctor that did OB/GYN.  When Carl first came here, there were

16 actually three African-American private practitioners that

17 delivered babies to people who had Medicaid, just poor people,

18 people who had no insurance.  Paul Rice, Carl Reddix and I

19 think Freda Bush was the other practitioner.  And that's just

20 the environment that he was in, and he -- he gave of himself in

21 that regard.

22 Q   Mr. Johnson, do you know anything about Dr. Reddix's

23 relationship with Christopher Epps?

24 A   Only what I have read.  I mean to be honest with you, I

25 knew nothing about Carl's relationship with Christopher Epps.

1  And when it did come to light to me --

2  Q   I was going to ask you how did you find out the situation

3  that Carl finds himself in today?

4  A   I was at my office and Carl called me middle of the day and

5  said he needed to talk to me right away.  And he came by the

6  office and he had had an interview with the FBI.  They had

7  invited him down to their offices for some reason other than *We*

8  *need to talk to you about Chris Epps,* and they kind of revealed

9  to him I guess some of the better evidence that they had.  And

10  Carl had a candid conversation with them and answered every

11  question.

12      And he came and talked to me, and I'm not a criminal

13  defense lawyer.  What I know about criminal law or criminal

14  procedure you can put in a thimble.  And so I ended up getting

15  another lawyer involved and Charlene Priester is a good friend

16  of mine who I respect her judgment, and I invited her over.

17  She knew Carl.  And we tried to help figure out how to get him

18  some help.

19  Q   What was your personal reaction?

20  A   I was shocked because I have known Carl a long time but I

21  didn't know anything about his involvement with Chris Epps.

22  And I would never have imagined that we would be sitting here

23  today discussing the things that we are talking about.  I just

24  wouldn't have imagined it because of the Carl Reddix I knew.

25  Q   I want to talk to you briefly about the Carl Reddix you

knew before that and the Carl you know today.  What are the
characteristics that you see in Carl that you would want the
court to consider or know about in formulating its sentence
today?

A   This whole incident is really out of character for Carl
Reddix.  I don't know how long it went on, but I would have bet
you -- if you had bet me a million dollars that I would be
sitting here having this conversation with you, I would have
taken your bet and I would have given you odds against him
because of who this guy is.  Reddix has always been a very
proud man.  He has always cared about his reputation.  And he
has given more to people than I can even begin to tell you.

    I mean I will tell you one of my early remembrances of Carl
is we had just starting doing business with each other as far
as health legal matters, and Carl was in the Wal-Mart parking
lot.  And I drive a pickup truck and he had a pickup truck, and
he had bought all these bicycles and he was just going to
deliver the bicycles, it was this time of the year, to these
churches to distribute to poor children.  And that was what he
did every Christmas.  I mean he bought 30, 40 bicycles.  And I
don't know if anybody ever knew that Carl did that, but that's
the kind of guy that he was.

    Intelligent, proud, ambitious and dedicated to education
and trying to do -- to help the community that he came from and
he lives in.  That's the Carl Reddix I knew.

Q    Are there any other situations where you saw Carl in a way
that you believe more accurately revealed Carl's true
character?

A    Yes.  Any number of things.  Carl asked me over the
years -- I have gone to Tougaloo College and contributed a
little time at Tougaloo because Carl contributed time at
Tougaloo.  Tougaloo is a historically black college, poor
college, survives on private funds for the most part, alumnus.
Contributions are not what you find like in other SEC schools,
anything like that.  And just keeping the lights on at Tougaloo
is difficult sometimes.

But Carl started this -- and I won't forget this.  He
started this entity called the Kincheloe Group, and Kincheloe
was the science division or the science building at Tougaloo
College.  Carl ended up contributing his own personal money,
his time.  He raised several hundred thousand dollars.  And all
it was about was trying to encourage kids to study the sciences
as well as direct people towards medical school.  And he
brought in guest speakers to kind of motivate these kids.

And Dr. Richard McGinnis is a Harvard graduate, and he was
like the father of Kincheloe chemistry professor.  And this I
know.  Carl contributed to -- personally contributed to Richard
McGinnis' salary so that McGinnis could spend more time -- less
time teaching and more time trying to continue the relationship
that Brown Medical School had with Tougaloo College and to try

1    and advance the premed program and get more people involved
2    with it.
3    Q   Mr. Johnson, how would you characterize your current
4    relationship with Carl?
5    A   I consider myself a very close friend of Carl Reddix.
6    Q   And have you had an opportunity to see him and interact
7    with him since all of this came about?
8    A   I have.  And I have talked to him regularly.  And the --
9    the Carl Reddix I guess in comparison to the Carl Reddix
10   pre-Epps, Carl is still the same man in many ways in that he is
11   still involved with giving of himself.  He is less prideful.
12   He is a little more humble.
13       And I will never forget the day that Carl came over and
14   told me about this whole incident and we got a lawyer involved
15   for him.  Carl was ashamed of himself because, you know, Carl
16   let himself down, he let a lot of people down, a lot of people
17   that really respected him.  And I think he will always carry
18   that with him.  Carl is ashamed of what he has done, and he
19   will always be ashamed of it.
20   Q   Mr. Johnson, what are your personal views about what Carl
21   has to give to the community when this is all finally behind
22   him?
23   A   Well, I think -- I know that Carl will always contribute to
24   his community.  There are some things he might not be able to
25   do anymore.  Carl has been a significant factor in this medical

community particularly as it relates to healthcare to

African-Americans.  And he is not going to be able to do that

anymore.  Carl has lost his career.  He has lost his standing

in the medical community.  He has -- his reputation both inside

Mississippi and outside Mississippi in that he does have a very

wide network of friends.  I think that that's been blemished.

But about three weeks ago I went over to Reddix -- an

office that Reddix was in, and he had convened a group of

people.  And what he was working on and he will continue to

work on this, I'm sure, but as a consequence of him doing this

prison medicine, Carl had the idea that a lot of the young men

that are in college sports that act out and that have all these

issues that college football players have demonstrated over the

last few years, that in many regards many of those young kids

have some of the same issues that inmates have, a large

percentage of them do, probably could use some mental health

guidance, they could use some life coaching.  And that's kind

of what he has been working on in the last few months.  And he

is not making any money on that, I mean, but it is just some

programs that he is trying to get instituted in colleges.

I think Carl will always be involved.  I think he will be

involved with healthcare although he won't be able to practice

medicine because that's who he is.  I mean I think that's part

of his nature.

Q   Mr. Johnson, is there anything else you would like to tell

the court that you haven't already said in determining its

sentence?

A    I do.  I would like to ask the court to be lenient on Carl

Reddix.  I'm asking that you be merciful to be honest with you.

I mean the guy has lost everything.  I now understand that he

is responsible for a two and a half million dollar forfeiture.

And he has been ruined financially, and I think that he has

suffered tremendously as a consequence of all of this.  And I

would ask that you take that into consideration with your

sentencing.  And essentially that's all I have to say, Your

Honor.

        MR. CORY:  Your Honor, I don't have any further

questions.

        THE COURT:  Any cross?

        MR. LAMARCA:  Your Honor, the government has no

questions.

        THE COURT:  All right.  Thank you.  Mr. Johnson, you

can step down.

        MR. CORY:  Your Honor, at this time I would like to

turn over the podium to my cocounsel.

        THE COURT:  Certainly.

        MR. JOHNSON:  Good morning.

        THE COURT:  Good morning.

        MR. JOHNSON:  May it please the court?  Judge, I don't

know a whole lot more I can add.  Sentencing, as you are well

aware, my forte is arguing closing arguments so I would
respectfully ask that you -- well, be patient with me.  I won't
argue outside the guidelines.  But I would like to talk about
this in terms of a perspective that -- in keeping with *Booker*
where it talks about -- I'm asking in this argument for a
departure from the guidelines.  And so when I think about that,
I think about who Carl Reddix is.  And I have a perspective as
his lawyer and in my other vocation as a legislator.  And part
of what *Booker* talks about in talking about a departure in the
heartland sentencing venue, what they talk about is how --
how -- how is he different from other defendants in this case.

I would begin to say that when I look at Carl Reddix,
I am not only his lawyer but I am also his friend.  And what I
know about him is that everything about this case starts with
service.  Carl Reddix grew up in Mississippi and was smart
enough to do anything he wanted to do.  He chose a profession
that arguably is probably the highest calling of service that
you could have.  He chose to be a doctor.  He left here, went
to school and chose to come back, and I would venture to say
arguably that serving as a doctor in Mississippi is probably
the highest calling of service as a doctor you can have.  And
so when I looked at the other defendants in this case and I
looked at what they did, they were either intermediaries or
they were people who essentially were in the business of
corrections for profit or for a way -- an inventive way to make

money.

Carl Reddix got involved in health medicine at the request of the Hinds County Sheriff who needed help in a jail where they were not meeting the corrections audit, where people were sick and dying in jail and they needed doctors who were willing to come in and do something. These were two young doctors that decided to do that.

Let me make a point that these were doctors who got involved and Carl Reddix was a doctor who got involved in corrections medicine before Chris Epps was any more than a guard at Parchman. So for 10 years. And by the time any of the salient things that happened in this case happened, for 10 years and upwards of 15 years, Carl Reddix was doing corrections medicine in an exemplary way without any interruption, without any shakedown from anybody, doing his job with exemplary marks from everybody.

So when I talk about and I make this argument about why there is a difference and why there should be a departure, here is a man who committed his life to service and committed his profession to service and committed his effort in corrections medicine as a way of service. And we talk about this two and a half million dollars, and if you look at the accounting and if you look at the numbers, there was no profit in Health Assurance. Health Assurance operated essentially at a loss. That's because every bid that Carl Reddix made was

either half or much lower than any other bid that was bid on
these projects.  And he never paid a dime to get any
information early, and there was no record of it, there is
nothing on the tapes that suggest that, that he got any
advantage in bidding.  He simply made his bid based on the work
and the hard work that he did.

THE COURT:  Let me interrupt you on that.  I thought
the PSR included a conversation where he was discussing a
competitor's bid with Epps and in an effort to essentially
block that bid.

MR. JOHNSON:  And I'm not here to argue with the
court.  No.  That conversation took place after the bidding
process had taken place and a discussion was essentially about
what the other bidders -- the information they didn't have as a
result of coming to the bidders conference where the
information was provided.

THE COURT:  I mean had the contract been awarded at
that point?

MR. JOHNSON:  Had the contract been awarded to?

THE COURT:  At the point of that conversation.

MR. JOHNSON:  No, the contract had not been awarded,
but there was no information about what bids and what the price
on the bids were.

THE COURT:  Okay.

MR. JOHNSON:  But all of that aside, Your Honor, my

1   perspective also is that when all of this began and took place,

2   I remember back in 2007 when Carl Reddix had been in the

3   corrections business now for over 11 years.  In 2007, Carl came

4   to the legislature complaining about the fact that Chris Epps

5   wanted to force him to pay somebody to come and lobby for him

6   to have a contract and he didn't feel the need to do that.  And

7   the record will reflect that he went to the Governor, the

8   Lieutenant Governor and eventually got to the Speaker of the

9   House where there was a conversation that was had.

10          I was in that meeting.  When that meeting was over

11  with, we were able to convince Mr. Epps that he needed to let

12  Dr. Reddix do his work and leave him alone.  And that was the

13  end of that.  Five years later what I hear is that Chris Epps

14  who is now the Chairman of the National Corrections Association

15  and Dr. Reddix had bid and won a contract with two of the worst

16  facilities in the state, he finds himself after going to the

17  people in charge, the people who were the oversight for Chris

18  Epps, and none of them did anything, found himself in a

19  position where Mr. Epps told him that the contracts that he had

20  already been awarded and won that he did not receive any

21  information about that he won because he was the lowest and

22  best bid that he had to pay him in order to keep those

23  contracts.

24          And so I would assert that I got involved in this to

25  help him fight this issue, but this is not a jurisdiction where

1    shakedown or extortion is recognized as a defense.  And so Dr.

2    Reddix pled guilty because that was the only fight that was

3    left there for him.  But he never -- he never approached or

4    asked Chris Epps for anything.  This was Chris Epps' scheme.

5            And I understand that culture.  I know that culture

6    because Cecil McCrory is a former legislator, Irb Benjamin is a

7    former legislator, and what they know is *You scratch my back, I*

8    *will scratch yours.*  Carl Reddix doesn't know that culture.

9    What Carl Reddix knows is that *If I do my job, I do it in an*

10   *excellent fashion, I do everything that I am supposed to do, I*

11   *meet all the requirements that the contract asks me to meet,*

12   *then that should be enough.*  And that had been enough up until

13   2012.  That had been enough up until 2007.

14           So when I stand here and ask the court to be lenient

15   and make a departure, I think about the person who started this

16   whole process because he was interested in service.  I look at

17   the person, an educator like Ms. Dillon who lives in Columbia

18   that talks about the fact he would drive three hours and come

19   down to talk to people in a rural community about -- women

20   about their healthcare and assert that she doesn't know how

21   many people whose lives he may have saved and prevented from

22   having cancer or some other debilitating disease because they

23   understood, educated in a medical sense about things they would

24   otherwise not know.

25           I think about young doctors like Dr. McShan and Dr.

Wadell who came to this city interested in practicing medicine
and had nobody to help them.  He in some cases reached in his
pocket to help them with expenses to get them going.  Dr.
Wadell tells the story of being a doctor in this town that had
nobody, didn't know anybody, and Dr. Reddix came to his aid and
told him he would help him.

         And a young medical student who Carl knew from
college, Dr. Billups, who found their self 1600 miles away from
home in a hospital in Boston not knowing -- in Rhode Island not
knowing anybody, not having anybody, and Carl in the middle of
his medical studies found a way to go check on her and make
sure that his former fellow student from Tougaloo was doing
okay.

         And I look at a person who understood the value and
the service of being involved in the Boy Scouts and how it was
important to bridge that gap in the community to help young
African-American boys who otherwise wouldn't ever have that
ability to deal with any of those issues and rise to the status
of being chairman of that organization.

         This is a fraction of the kind of things a person
would do that he otherwise -- that other people wouldn't do.  I
look at and I listened to hours of these tapes where he was
talking to Chris Epps.  I know Chris Epps.  And I know what
that was.  I was in a meeting where they almost came to blows.
Chris Epps was not a friend of Carl Reddix but Chris Epps was a

1    man, was a bully, was a man who demanded a certain amount of
2    attention, demanded a certain amount of gravitas from people,
3    and Carl Reddix gave him that.  He didn't give him that to gain
4    an advantage on contracts, he didn't give him that to defraud
5    the State of Mississippi; he gave him that in an effort to
6    maintain his ability to continue to provide the service he was
7    providing to people in prison.
8             People in prison are the only people in the country
9    who have a constitutional right to healthcare.  In the State of
10   Mississippi, they were being sued by the federal government and
11   everybody because they were not providing that healthcare.
12   Health Assurance and Carl Reddix did that.  It's different from
13   a person who was an intermediary for a major company or a
14   lobbyist for a company and going to Chris Epps and taking
15   bribes in order to get contracts.  That's not who Carl Reddix
16   was.
17            Carl Reddix is the only co-owner of a business that
18   has been indicted in this case.  Irb Benjamin, Cecil McCrory,
19   all represented companies, and none of those companies, none of
20   those CEOs have appeared in this court or in any federal court
21   or been indicted in any way.  Carl Reddix was here, a
22   Mississippian providing a service, doing his job.  And but for
23   the fact that Chris Epps came and essentially instituted a
24   shakedown, he would have continued to be doing business today.
25            This is in no way in an effort to absolve himself of

responsibility.  I'm telling you as his lawyer Carl Reddix
accepted responsibility.  He knew he did wrong.  He knows he
has done wrong.  But the service he has provided to this
community and the service he can continue to provide is
immeasurable.

     And, Judge, I would just offer this.  Here is a man as
Walter Johnson said who has lost his career, over 25 years of
practicing medicine, has lost his ability to make money in any
way, has lost all of his savings, his reputation, the damage it
has done to his family, his children, his mother, his wife.

     One thing that *Booker* recognized, *Gall* recognized, is
that at some point what is important is whether or not there is
punishment.  And I would assert that Carl Reddix has been
punished, that any more punishment is not necessary.  And so I
would ask the court respectfully for a departure, a departure
from the guidelines that would show mercy and would recognize
the fact that Carl Reddix has paid the price.  Thank you,
Judge.

     THE COURT:  All right.  Thank you.

     MR. CORY:  Judge, at this time Mr. Reddix -- Dr.
Reddix is ready to give his allocution.

     THE DEFENDANT:  Thank you, Judge.  Let me just start
by saying this is the absolute hardest thing I have ever done,
and I thank the two Johnsons and Mr. Cory and Ms. Ross for
excellent counsel.

1          Just briefly just to answer a question that you asked

2     of Robert about what you saw in the pretrial report, it was

3     historical data that Mr. Epps was conferring.  Not all of our

4     contracts were bid, prepared and turned in all at the same

5     time, so there is no way that anything that -- there is no way

6     anybody would know.  Anyway, I take full responsibility for

7     what I did, and I, without question, gave kickbacks to Mr.

8     Epps.

9          I'm sorry that I have brought my family, my friends,

10    my patients especially and my peers through this ordeal, and I

11    have to tell you that I am a better person now than I was, and

12    I'm not bitter.  I am a better person because of the love, the

13    understanding and forgiveness that these people that I have

14    just named and most of whom are here have blessed me to enjoy.

15         Again, I'm here because I gave kickbacks to

16    Christopher Epps in prison contracts as he demanded.  It was

17    wrong each time I did it.  I paid him in cash and I never told

18    anyone that I was giving him any money, including my closest

19    confidantes.  And, for the most part, I didn't tell my wife.  I

20    didn't tell my wife.  I didn't tell my brother.  I didn't tell

21    anybody.  I didn't tell Robert.  I didn't tell Walter.  And I

22    talked to all of them very, very often.

23         I regret that decision, and I will live with those

24    consequences of that decision for the rest of my life.

25         As has been stated, I have sacrificed a lot so far in

my estimation.  Most germane to me, and I will apologize again
because all of this is so hard for me, but, you know, the most
important right that I have sacrificed are voting rights.  I
last voted in the mayoral election in the primary but I was not
able to vote in the general election because I had entered a
guilty plea and was not eligible to vote.  I equate --

THE COURT:  Quiet, please.

THE DEFENDANT:  I'm good.  I equate voting rights to
civil rights and racial disparity and health.  They are just a
synonym for voting rights in my estimation.

The other thing that I have lost is my medical license
that I have earned after spending 13 years after high school
and becoming a gynecologist and a public healther.  I am proud
that I had an opportunity to go to -- that I went to America's
best college, Tougaloo College, and three of America's best
medical institutions.  If I had stayed in Mississippi and gone
to medical school, which I could have in 1984, I would not have
been able to be a gynecologist because in the State of
Mississippi they didn't train African-American gynecologists
until the year 2000.  So, in order to get what I got, I had to
leave.

I lost my license because of my -- because of the
guilty plea, and the reason was moral turpitude.  I had to look
up turpitude.  I didn't know what that meant to tell you the
truth.  I also lost my American Board of OB/GYN certification

that I had had since I got back and all of my high school

privileges and everything associated with the practice of

medicine that had nothing to do with the practice of medicine.

I lost my practice that I started in 1989. I had to

leave. Thankfully they welcomed me back and I still can sit in

my office and read. I bankrupted a prize company that we

built, as Walter was saying, on an idea, a need and what I felt

was a responsibility. And, as a result of that, the

bankruptcy, one of our vendors, a family-owned business,

pharmacy business in Alabama, we owed a lot of money. We owed

over a million dollars to. And I hate that and I take

responsibility for that as well.

Part of that is because the state didn't pay us all of

the money that they don't argue that they owe, and we -- it's

just one of those things as a result of all of the consequences

of my action without question.

I have lost my civic leadership positions in iconic

organizations that I had worked tirelessly for to ensure that

they had represented themselves fully in my community and

communities that look like mine, like the Boy Scouts and the

Mississippi Symphony Orchestra. I was the president of the Boy

Scout Board in 2006 and '7 and have worked throughout our

council, and I know that I was a regular and frequent persona

for that organization.

And the symphony orchestra, I helped them to get

1   inside the -- because they didn't have entree into Jackson

2   State and Alcorn's music departments to help get their students

3   fully accessed to what the Mississippi Symphony Orchestra does

4   with their professional musicians.

5         I would like for you to understand that I have earned

6   every opportunity I have ever been afforded.  My advisers when

7   I was in Boston and Baltimore didn't understand why it was

8   important to me to come back home.  It was important because

9   somebody had to do it.  And I had been afforded an excellent

10   educational pedigree and I looked very much to sharing all that

11   I had learned.

12         I want the court to know that I would be the first to

13   admit that I have lived a very privileged life.  No silver

14   spoons.  My parents were public school teachers in a small town

15   in Mississippi.  No gifts.  No set-asides.  My hard work

16   afforded me opportunity for, as I said, an excellent academic

17   pedigree, a chance to get to know the best and brightest people

18   in the world.  And when I say best and brightest, it has

19   nothing to do with educational attainment.  Some of my best

20   friends have not even gone to college.  And most importantly,

21   my hard work has allowed me the opportunity to participate in

22   the bettering of people's lives, especially women and people of

23   color, and I took that very seriously.

24         I have never compromised the practice of medicine or

25   the management of medicine.  I always put the needs of my

patients and my inmates before my own.  And since I have been
afforded such, so much, I have been striving my entire life to
give back more than I take.

         And I care about prison medicine for two reasons.  If
you are going to be an entertainer, you want to be in New York
and be around other people so you can learn and get better.  In
medicine, you want to be around the worst so you can help them
and do the most good.  And since the people in the corrections
environment look like me in a significantly disproportionate
way, at least 80 percent, it was important to me that somebody
like me, well-trained and committed, start talking to you about
Mr. Epps.  And I won't bore you with a lot of things you have
already heard, but I think it is important to know that
especially with the meeting that Mr. Johnson was talking about
in early January 2007 when Epps demanded that I hire a specific
lobbyist to help with our Walnut Grove contract that we had had
for six years at that point, I told him no and meant no.  He
went on a long rant and he cussed me, threatened to take the
Walnut Grove contract and call every sheriff in the State of
Mississippi and demand that they do not do any business with
us.  That's why I had solicited Robert's help as a legislator
to go to the Governor, Lieutenant Governor and Speaker to seek
help.

         And again, to my knowledge, the Governor or Lieutenant
Governor didn't do anything.  The Speaker convened us in his

office and tried to settle the dispute.  Epps told the Speaker

who had just had a stroke and was frail that the Speaker nor

the other state's highest officeholders could tell him how to

run his agency.  The speaker turned red and chastised him, and

eventually he calmed down, and he told the Speaker that he

could work with Dr. Reddix as long as Dr. Reddix understood who

the tallest horse at the trough was.  A shallow victory.

　　　　　But I have to tell you that, as Robert touched on, one

of the hardest things other than this, and this is definitely

harder, but the second hardest is not fighting, physically

fighting Epps for throwing his hand in my chest as he was

looking at the Speaker when he said those words and I needed to

understand he was the tallest horse at the trough.  It was the

only time in my life that I wanted to fight.  I have never had

a fistfight.

　　　　　Now fast forward to 2012, Fall of 2012, when Mr. Epps

came to me after we were working at the East Mississippi prison

contract and the Marshall County contract, but mostly all of

our conversations centered around East contract because of the

heinous conditions we had inherited.  Shortly after startup we

were having status conferences at the Department of Corrections

because things were so bad.  We were trying our best to right

this ship as quickly as possible.  And sometime in that

timeframe during that meeting or one-on-one after one of those

status conferences, he came to me and he told me that he

required $2,000 per month per contract or he would assure that our invoices would be significantly delayed. And unfortunately I agreed to those terms.

My lawyers have tried to get me to explain the details of that meeting. And, honestly, Judge, I don't remember it. I blocked it. I have had a few traumatic events in my life but none that I have blocked. For example, in '77 when I was in college, I stood between two men who were fighting and one who pulled a gun and was about to shoot another guy, and I stood between them. I can tell you everything about it.

I can remember in 1987 my wife and I, residents in Baltimore, we had carbon monoxide poisoning, came within inches of dying. I can give you a blow-by-blow of every event that happened that day. Or in 1988 when my son, six months old, had pneumococcal meningitis and almost died. I can tell you about the phonecall that my mother made about my father's colon cancer. He eventually died. Or I can tell you all about my mother-in-law's stroke when my father-in-law called and talked to me to tell my wife that her mother had had a major stroke and to come home. I can tell you everything about it.

I can tell you everything about my brother's diagnosis and where I was when we talked and I heard. I can tell you everything about my FBI interview. But I can't tell you anything about the particulars of exactly what he said, Epps said, that made me agree to start paying the kickbacks. I

don't know.  I can tell you my moral compass was traumatized

somewhere away from true north.

Through a lifetime of challenges, growing up in a

transitioning Mississippi in the sixties, integrating two

public schools and a Catholic church and then coming back to

try and be a leader in our community, especially around

healthcare, I have had plenty tests of character.  I have never

failed.  This mental block is obviously protecting my conscious

brain, and I have never had memory loss this profound that I

cannot remember anything about it.

Sir, I have to tell you that while Epps may on some of

these recordings talk about doing something to be helpful, our

proposals were the lowest and the best bids on each of the

contracts that we were granted.  In fact, specifically around

the time that I had met with Epps and this demand had been

given, Epps -- we as a company had drawn down about $700,000 on

our $1 million line of credit that we had gotten years earlier

for glitches and reimbursements from public institutions.  So I

know that what I was feeling was stress from overwhelming

financial exposure, and I knew that with the front-end costs

that we had expended that we would not -- we would not be

profitable on that contract and it would take us years to

recoup those front-end costs.  So I know we were feeling

pressure.

But the other part of that timeframe is that Mr. Epps

1    was at that point in time the most powerful man in corrections.

2    He was President of the American Correctional Association and

3    he was President of all of the State Prison Chiefs. Everybody

4    seemed to bow down and kiss his ring. And because I had

5    witnessed how he talked to the Speaker and the disdain that he

6    had for the oversight from state government, I'm sure that that

7    played a significant part.

8         I can in addition tell you that I had seen how Mr.

9    Epps was treated by his deputy commissioners and all of his

10   staff. They all called him boss. They never called him Mr.

11   Epps. They rarely called him commissioner. They all called

12   him boss when they were in his presence. I was always amused

13   by their interactions, and my patronizing name to him was

14   bossman. And whenever he asked about his payments, I always

15   said, *I got you.* These conversations were chummy by design.

16   His ego required it. He was a quintessential narcissist.

17        Our relationship, however, when not talking about

18   business really was locker room talk because we had very little

19   in common. And, in fact, he is probably one of the few,

20   probably the only black man in Central Mississippi that I had

21   absolutely no friends in common with. I can't say that about

22   too many people.

23        Working toward closure, and this is going to be the

24   hardest part, as I have done earlier, I want to thank the court

25   and apologize to the court for kickbacks, and I want to

apologize to my family, my mother, wife, brother, my children,

my nieces.  I'm putting them through hell, too.  I want to

thank my patients and apologize to them.  I thank all my

friends.  My church members are here.  My priest is here.  My

peers are here.  My former employees are here.  I thank all of

them, but I especially thank them for the volumes of letters

that they have sent to you addressed to you.  I owe them all so

much.  I have grown so much.  Again, I am a better person, not

a bitter person, all as a result of the angelic wings that all

of you allowed me to ride.  I'm humbled and happy to have had

all of the life connections that I have been afforded.  When

this is over, I promise I will do everything in my power to

devote myself to this community who stood by me so steadfastly.

I love them all.

         And I tell you, Judge, as you can see behind me, there

are a lot of men here.  I am a gynecologist.  You would think I

would have a lot of women.  And, you know, I have never been

told *I love you* by the volumes of men that I have been told who

I have had the bear hugs and the embraces have been important.

         There is one promise I want to make to you.  The

probity and rectitude that has always guided my true north will

be my lighthouse that it has historically been, but for this

one transgression.  I am very confident that you will and have

considered all of the submissions and the facts in my

particular case, and I'm confident that you will be imminently

fair with whatever my final judgment is.  Thank you so much.

THE COURT:  All right.  Thank you.  You mentioned the letters.  Of course, I have received a lot of letters.  I have read them.  I have had them scanned.  They will be received into the record at this point.

Mr. LaMarca, do you have any argument on behalf of the government?

MR. LAMARCA:  Your Honor, we do stand behind our recommendation that we have made in the plea supplement, the recommendation being 84 months or the lower 25 percent of the guideline range, whichever is lower.  We make that recommendation based upon consideration by the United States Attorney's Office of the sentences and as well as the conduct of all other people involved in the Epps corruption matter.  So we make that recommendation based upon that.

We do want to also as part of that recommendation let the court know that there were other people that were involved with Mr. Epps on behalf of their own companies and not as a consultant.  I mention Mark Longoria to the court who was a CEO of Drug Testing Corporation and actually made bribes and kickbacks to Mr. Epps for contracts to his company and as well as Irb Benjamin on behalf of Mississippi Management Corporation.

I bring those things to the court's attention strictly because it appears that these individuals also attempted to and

1  did obtain contracts with the state, the Department of

2  Corrections, that is, on behalf of their companies in much the

3  same manner that took place in the instant case before the

4  court.

5       With that being said, we do stand by our

6  recommendation.  And also we wanted the court to be aware that

7  I had spoken through or to defense counsel.  We have filed just

8  several minutes ago a motion to amend the agreed preliminary

9  order of forfeiture.  There is a matter of payment of the

10  forfeiture.  That motion is filed in an effort to protect and

11  perfect security interests in certain assets of the defendant.

12  The government and defense counsel are attempting to work out

13  arrangements to satisfy that forfeiture, and we intend to work

14  towards having it satisfied by the report date that the court

15  may give or even shortly after that.  We will then supply the

16  court with an order at the U.S. Attorney's discretion as to the

17  satisfaction of that forfeiture amount which in essence would

18  be an order satisfying the forfeiture amount and the order of

19  forfeiture that the court has put in place.  We wanted the

20  court to be aware that that motion was filed but that there

21  would not be an order forthcoming on that while we attempt to

22  work out --

23       THE COURT:  Wait.  Say that part again.

24       MR. LAMARCA:  There would not be an order forthcoming,

25  proposed order to the court for the court to rule on that

motion until the parties have had ample opportunity to discuss

fully satisfying that order of forfeiture in a manner that may

be less burdensome to all parties involved.

THE COURT:  All right.  So let me ask you about that.

First of all, does it change the amount?

MR. LAMARCA:  No, sir.

THE COURT:  I think it's Rule 32.  I'm obviously

required to enter a preliminary order of forfeiture before

sentencing.

MR. LAMARCA:  Yes, sir.

THE COURT:  And I'm required to announce the

forfeiture as part of the judgment.  I have to orally announce

it today.  So I have never had anybody amend it during the

hearing, and I'm not sure procedurally how that works.

MR. LAMARCA:  Your Honor, you would have to announce a

final order of forfeiture in the amount that the court

determined in its order.  The amendment of an agreed

preliminary order of forfeiture, the motion is filed as to

assets of Dr. Reddix as far as substitute assets are concerned.

We do not intend to present the court with an order on

that until Dr. Reddix has had an opportunity.  It was the

government's request that that forfeiture be satisfied today,

but through discussions with defense counsel, there are a

number of matters that I understand the defendant has to

undertake in an effort to satisfy the money judgment.  But I

1    wanted the court to be aware.

2            THE COURT:  And obviously I haven't seen the motion

3    you are talking about.  Does it amend the preliminary order of

4    forfeiture?

5            MR. LAMARCA:  It is a motion to amend the preliminary

6    order of forfeiture.

7            THE COURT:  And you don't anticipate that an order

8    would be entered granting that until after sentencing?

9            MR. LAMARCA:  That would be correct, Your Honor.  Now,

10   we understand the court will enter a final order of forfeiture.

11   The motion's purpose was to put defendant and everyone on

12   notice of the assets that the government is aware that the

13   defendant does have.

14           THE COURT:  All right.  I'm asking a procedural

15   question.

16           MR. LAMARCA:  Yes, sir.

17           THE COURT:  Whether I can enter an order amending a

18   preliminary forfeiture order post judgment.

19           MR. LAMARCA:  I would suggest to the court you could

20   not.  I suggest to the court that at the time when an order

21   would have to be entered, an amended motion to substitute

22   assets on the final order of forfeiture would be the proper

23   vehicle within which to enter an order reflecting substitute

24   assets.

25           THE COURT:  And I may be confused, but I thought you

1   said that the motion that was filed today was to amend the
2   preliminary order.

3       MR. LAMARCA:  That is the way it is couched as we
4   speak considering that that is the only forfeiture order
5   currently in place with the court.  There is no final order of
6   forfeiture.  There is only an agreed preliminary order of
7   forfeiture pending or actually in place before the court.

8       THE COURT:  I know, but the reason I'm confused, I'm
9   just not following this.  I think you just told me that you
10  didn't think I could enter an order amending the preliminary
11  order post judgment, but that's what the motion asks me to do.

12      MR. LAMARCA:  The motion asks the court to amend the
13  agreed preliminary order of forfeiture.  That motion may become
14  moot after this hearing today, but it does perfect, I believe,
15  or it does protect the government's notice to the defendant of
16  the assets that the government understands the defendant has
17  and the defendant would be on notice of possible fraud if
18  assets were depleted without the government's consent.  That is
19  the purpose of the filing, Your Honor.  The motion itself may
20  become moot once the final order of forfeiture is in place, and
21  then we would file a --

22      THE COURT:  I think I'm following you now.  Let me
23  hear from Mr. Cory.

24      MR. CORY:  Yes, Your Honor.  Dr. Reddix is cooperating
25  and has the intent to cooperate with the government to satisfy

1    the monetary forfeiture judgment.  My understanding, the

2    purpose is exactly what Mr. LaMarca said, which is the money

3    judgment doesn't specify assets.  There are a number of assets

4    that are disclosed, and I think the government's concern was

5    simply putting in the record and the world on notice and the

6    defendant on notice that these are the assets we consider

7    potentially substitutable but allowing the defendant the

8    opportunity to orderly liquidate assets.

9            THE COURT:  Okay.  All right.  So there is no request

10   that I rule on that motion at this time and it may be that I am

11   never asked to rule on it.  Is that fair?

12           MR. LAMARCA:  Yes, Your Honor.

13           THE COURT:  Okay.  We have been going now for a bit,

14   and I need a little bit of time to pull some notes together.

15   Is there anything else from either side before we adjourn and I

16   come back and enter judgment?  Anything from the government?

17           MR. LAMARCA:  No, Your Honor.

18           MR. CORY:  No, Your Honor.

19           THE COURT:  All right.  Court will be in recess for 20

20   minutes.

21       (*Recess*)

22           THE COURT:  All right.  As I mentioned, I did receive

23   a number of letters that I read.  One of them was from Dr.

24   Andrew Taylor, and he wrote a letter on Dr. Reddix's behalf and

25   he, I think, observed perhaps the obvious, that I face a

difficult task.  He is certainly right.  Sentencings are always difficult and they are always a weighty decision.  I take them serious whether I have a courtroom full of people or if I have a defendant standing there with just his lawyer and nobody else to back him up.

This case is perhaps more difficult because when I look at the record in front of me, in light of Dr. Reddix's history and the seriousness of the crime, it really doesn't make much sense.  That said, there are tools under the law to help me reach a just result.

First there are the United States Sentencing Guidelines which help courts determine the appropriate sentence based on certain objective factors.  Regardless of your race, age, gender, where you live, how much money you make or other socioeconomic factors, the guidelines tell us what the appropriate sentence would be for the certain conduct that was committed.

In this case, based on the sums of money involved, the guideline range is 97 to 120 months.  But, as Mr. Johnson correctly argued, the guideline range is advisory only, so while I must consider the range, I am not required to follow it.  Instead, I also have to consider and must follow the factors listed in 18 U.S.C. Section 3553(a).  Under that statute the sentence must be sufficient but not greater than necessary to accomplish some very specific goals.

1          In this case, I address it the same as I do in all

2     cases, and I start with those guidelines and the parties'

3     agreement and I try to decide whether that sentence would

4     satisfy the goals of the statute.  Here, the government has

5     recommended a sentence of 84 months.  That sentence would be

6     below the sentencing guidelines and therefore represent what's

7     called a variance.  The defendant is asking for a more

8     substantial variance and it has been suggested that he should

9     not serve any term of incarceration.

10          I am going to grant a variance below the government's

11    recommendation, but a sentence without incarceration would not

12    be sufficient to meet the statutory goals.  Based primarily on

13    Dr. Reddix's personal history as he and Mr. Johnson recounted

14    it and as reflected in the presentence report, the severity of

15    the offense, the need for deterrence and the need to avoid a

16    disparity with the sentences received by the other defendants,

17    those are the main factors.  I will go into them in more

18    detail, but the sentence in this case will be 72 months.

19          First I look at the nature and circumstances of the

20    offense and the history and characteristics of the defendant.

21    Taking those backwards, I will start with the history and

22    characteristics of the defendant.  It's undisputed that he has

23    no criminal history.  He is highly educated with degrees from

24    some of the best universities in the country.  I also note that

25    after obtaining degrees elsewhere, he did return here.  He is

obviously intelligent.  He has a long history of civic
involvement and leadership.

In addition, I have -- as I have stated, I have
received and read well over a hundred letters from his friends
and family.  And those letters come from people from all walks
of life and all demographics.  There are people involved in a
legal profession, people involved in the medical profession,
there are a number of his friends and people he plays golf with
and works in Boy Scouts with.  There is even a letter from an
Assistant United States Attorney, and I don't think I have ever
seen that.

It's also remarkable to me how many close personal
friends Dr. Reddix has as evidenced today, but also I already
had that picture kind of painted from all the letters I had
read, and they all paint basically the same picture that Walter
Johnson painted when he testified as a man who is generous with
his time and his money, who is civically minded and who is
deeply involved and willing to help others.

There were a number of themes running through these
letters.  Almost all of them asked for leniency with some
saying that he had accepted responsibility and had cooperated
once he was approached by the FBI.  Those two factors obviously
will be considered and have been considered, and they will
impact his sentence.

All of this tells me that he is not your normal

1   defendant in a sense and that a sentence within the guideline
2   range would not be appropriate under the statute, but they do
3   not suggest that incarceration should not be imposed.  To
4   begin, the defendant was obviously capable of making an honest
5   and very comfortable living yet starting in 2012 began paying
6   Christopher Epps bribes of $6,000 per month to obtain or keep
7   contracts with the M.D.O.C.  I understand, Mr. Reddix, what you
8   said about that first meeting, and had that one meeting been
9   the only time where there was a transgression, this case would
10  look very different, but the conduct went well past that one
11  day.  It was not a one-time thing; it was a once-a-month thing,
12  and the deal grew over time.  The defendant was basically
13  paying $200 per month per contract, so when additional
14  contracts were added, the amount of the kickback went up,
15  eventually reaching nine and a half thousand dollars per month
16  by October of 2014.

17          Payments were in cash.  Dr. Reddix delivered them in
18  person to Mr. Epps.  And there is just no way to justify that
19  conduct over that period of time.  The meetings with Mr. Epps
20  from July of 2014 through October '14 were all recorded by the
21  FBI which then seized the money Reddix gave Epps during those
22  meetings.  The FBI also recorded numerous conversations between
23  the two in which the kickbacks were discussed and showed how
24  Epps helped eliminate competition.

25          I have also learned today that Dr. Reddix involved

others at Health Assurance to help hide the kickbacks on the

books.  According to the presentence report, over about a

two-year period Dr. Reddix paid Mr. Epps $187,500 in kickbacks,

and that resulted in contracts or related to contracts at an

estimated $32 million.  The profits, according to Dr. Reddix's

calculations that were submitted in the forfeiture issue, were

$2,532,876.

While in a colloquial sense there could be an argument

that this was aberrant behavior, under the guidelines in

Section 5K2.20, the planning that was involved, the duration of

the scheme, would preclude a departure based on that issue.

So, taking all of this together, I agree that Dr.

Reddix is outside the norm and should receive consideration for

his good works, but the scope, extent and nature of this crime

are simply too significant to impose an even lower sentence

than the one I will enter.

The next thing I have to consider is the sentence must

reflect the seriousness of the offense, promote respect for the

law and to provide a just punishment for the offense.  As I

stated, these kickbacks and the amounts involved were obviously

a serious issue that does require just punishment.  I also have

to make sure under the statute that the sentence affords

adequate deterrence for criminal conduct.  Public corruption

has obviously been a problem in our state and elsewhere.  There

is no doubt that Epps bullied his way into these deals, but

unfortunately there have been many Chris Epps in our state and
there have been many people willing to pay them for whatever
reason they may have.  And unfortunately I doubt that this will
be the last case that we see.  All of that undermines the
public trust in our government while reducing healthy
competition for public services.  There is, therefore, in my
opinion a substantial need for deterrence.

I also have to consider whether there is a need to
protect the public from further crimes of the defendant, and I
see no need in this case in that regard.

I have considered all the factors, but the last one
that I'm going to specifically mention is that I am required by
statute to make sure that the sentence does not create any
unwarranted disparities with other defendants.  I think that
this is a somewhat significant issue in this case although
obviously not the only issue I have considered.  As noted, Dr.
Reddix is not the only person who was paying kickbacks to Mr.
Epps.  There were eight related cases.

Just as a matter of fairness, in every case I always
try to make sure that the sentence makes sense when I compare
it to the sentences received by other defendants.  And that's
not always easy, because each case in its own sense can be a
little bit different.  One defendant may be more culpable but
cooperated more or may have a criminal history.  All these
things have to be considered.

In this case, Mr. Epps received a sentence of 235 months.  Mr. McCrory, after some reasons that are in his record that I won't repeat here in court, received a sentence of 102 months.  Those sentences in my mind are obviously appropriately higher than the sentence in this case based on the extent of their involvement.

Next I look at Sam Waggoner and Irb Benjamin.  Both had guideline ranges below Dr. Reddix's range.  Waggoner received a 60-month sentence, and Benjamin received a 70-month sentence.  Like Dr. Reddix, neither had a criminal history.  But one thing that made their ranges lower is that the benefits or losses associated with those defendants were well below those in this case.  Waggoner was just under $264,000; Benjamin was just over $300,000.

In this case, it's $2.5 million.  In my opinion it would create an unwarranted disparity if Dr. Reddix received a sentence below the one that Benjamin received.  Benjamin was paying for about the same length of time for the same basic reason but was paying a little less.  And the benefits attributed to him of the loss amount was about eight times less than those related to Dr. Reddix's case.

I also note and the name came up earlier that Mark Longoria received a 60-month sentence, but as I understand it, that sentence was the statutory maximum sentence for the offense to which he was found guilty which makes it less

1    comparable.

2          That leaves Robert Simmons.  Simmons received an

3    87-month sentence.  He worked for a time for Dr. Reddix, but he

4    also had other schemes with Epps, so his culpability is

5    arguably greater.  I would also note that -- I'm sorry.  I

6    think his culpability was greater.  The total benefits he

7    received were also more than those received by Dr. Reddix.

8          There were some other factors again in that case that

9    are on the record in that case that I won't go into that

10   resulted in a reduction to 87 months.  But based on all of

11   that, a sentence above that received by Simmons would be unfair

12   to Dr. Reddix.

13         That tells me that in this case a guideline sentence

14   would be greater than necessary.  To summarize all of that, it

15   seems to me that Dr. Reddix should fall somewhere between

16   Benjamin and Simmons, and this sentence does that.

17         It's also sufficient but not greater than necessary

18   when viewed in light of all the sentencing factors that I have

19   addressed and those that I have looked at but deemed less

20   relevant.  I would also note as I did early on that I always

21   try to calculate the correct guideline range whether I follow

22   it or not.  I have done this in this case, but the guideline

23   calculation itself obviously had no ultimate impact on the

24   sentence that's been imposed.

25         It is, therefore, the judgment of the court that the

1  defendant, Carl Reddix, serve a term of 72 months imprisonment

2  as to Count 7 in the custody of the U.S. Bureau of Prisons.

3  This sentence is outside the guideline range but is in

4  accordance with the factors found in 18 U.S.C. Section 3553(a).

5  The guideline range for a fine in this case is 15,000

6  to 150,000.  Based on the defendant's financial disclosures but

7  also the amount of the forfeiture, I'm going to impose a

8  sentence at the bottom of the guideline range of $15,000.

9  The term of imprisonment shall be immediately followed

10  by a two-year term of supervised release subject to the

11  standard and mandatory conditions as listed on the judgment

12  order in addition to the following special conditions:

13  1.  You shall not incur new credit charges or open

14  additional lines of credit without the approval of the

15  probation officer until such time as the fine has been paid in

16  full.

17  Second, you shall provide the probation office with

18  access to any requested financial information until such time

19  as the fine is paid in full.

20  Third, you shall participate in a program of mental

21  health treatment as directed by the probation office.  If

22  enrolled in a mental health treatment program, you shall

23  abstain from consuming alcoholic beverages during treatment and

24  shall abstain for the remaining period of supervision.  You

25  shall contribute to the cost of treatment in accordance with

1  the probation office copay policy.  That condition is obviously

2  based on references in the presentence report.

3       The interest requirement for the fine is waived.  The

4  fine is to be paid in full within 180 days of the date of the

5  judgment order.

6       Forfeiture in this amount -- in this case is entered

7  in the amount reflected on the preliminary order of forfeiture

8  in the amount of one million two hundred and sixty-six thousand

9  four hundred and thirty-eight thousand [sic] dollars.  It is

10 further ordered that the defendant pay the mandatory special

11 assessment of $100 which is due immediately.

12      All right.  Mr. LaMarca, you probably have a motion.

13      MR. LAMARCA:  I do, Your Honor.  We do move to dismiss

14 the remaining counts of the indictment, and I do have an order

15 for the court's consideration.

16      THE COURT:  All right.  Thank you.  I will sign that.

17 Why don't you come forward.

18    (DOCUMENT TENDERED TO COURT)

19      THE COURT:  Mr. Cory, is there any request here?

20      MR. CORY:  Yes, Your Honor.  Dr. Reddix would ask that

21 the court recommend that he serve his sentence at the Butner

22 Federal Prison in North Carolina.

23      THE COURT:  Okay.  Mr. Reddix, obviously that's not up

24 to me, but I will make that recommendation on your behalf.

25      Anything else?

1      MR. CORY:  Yes, Your Honor.  And we would ask that you

2 also recommend that he participate in alcohol treatment.

3      THE COURT:  All right.  I was considering that.  If

4 you are requesting it, I will grant it, and that will be a term

5 of supervised release that he shall participate in a program of

6 testing and/or treatment for alcohol or drug abuse.  Not that

7 there is a drug issue here.  But as directed by the probation

8 officer.  If enrolled in an alcohol or drug treatment program,

9 he shall abstain from consuming alcoholic beverages during

10 treatment and shall continue abstaining for the remaining

11 period of supervision.  He shall contribute to the cost of

12 treatment in accordance with the probation office copay policy.

13 I would also note that obviously the Bureau of Prisons will

14 screen and I think it's fairly typical to receive that care as

15 well.

16      MR. CORY:  Finally, Judge, we would move and make a

17 motion for the court that Dr. Reddix be allowed to remain on

18 bond and self report so that he can take care of financial

19 matters.

20      THE COURT:  Okay.  Mr. LaMarca, is there any reason

21 why the defendant should not remain on bond pending

22 designation?

23      MR. LAMARCA:  No, Your Honor.

24      THE COURT:  Okay.  Is the probation office aware of

25 any reason?

1          PROBATION OFFICER:  No, Your Honor.

2          THE COURT:  Okay.  That request seems perfectly

3    reasonable to me.  The defendant will be allowed to remain on

4    bond and voluntarily surrender to the institution designated by

5    the U.S. Bureau of Prisons on January 29, 2018, at noon.

6          All right.  Mr. Cory, any other requests?

7          MR. CORY:  No, Your Honor.

8          THE COURT:  Okay.  All right.  Dr. Reddix, when you

9    entered your plea, you gave up some rights to appeal.  But to

10   the extent that there are any issues that can be appealed, that

11   has to be done in a timely manner.  There are some exceptions,

12   but usually that's 14 days after judgment.

13         Mr. Cory, I assume you will discuss that with your

14   client.

15         MR. CORY:  Yes, Your Honor.

16         THE COURT:  I am required to say that if you cannot

17   afford an attorney, you can petition the court to appeal in

18   forma pauperis.

19         Dr. Reddix, I know this is a blow, and I want to

20   assure you it is not something that I took lightly in any

21   sense.  But I do want to tell you that unlike a lot of people

22   who come through here, you have a tremendous support structure

23   behind you.  And in some sense, today is sort of the beginning

24   of the light at the end of the tunnel.  I mean it's all in

25   front of you now.  You know what it is.  And I have no doubt

1    that with your talents and your support that you can make a

2    real contribution from here forward, and I hope that for you.

3            Is there anything further from either side?

4            MR. LAMARCA:  No, Your Honor.

5            MR. CORY:  No, Your Honor.

6            THE COURT:  All right.  Thank you.  We're adjourned.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

CERTIFICATE OF REPORTER

1

2

3       I, BRENDA D. WOLVERTON, Official Court Reporter,

4  United States District Court, Southern District of

5  Mississippi, do hereby certify that the above and foregoing

6  pages contain a full, true and correct transcript of the

7  proceedings had in the aforenamed case at the time and

8  place indicated, which proceedings were recorded by me to

9  the best of my skill and ability.

10       I certify that the transcript fees and format

11  comply with those prescribed by the Court and Judicial

12  Conference of the United States.

13       This the 7th day of February, 2018.

14

15                              s/ Brenda D. Wolverton_____
                                BRENDA D. WOLVERTON, RPR-CRR
16

17

18

19

20

21

22

23

24

25